**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **KAMAL MUHAMMAD,** | * | |
| **Petitioner,** | * | |
| **v.** | * | **Civ. No. DLB-23-955** |
| **WARDEN BAILEY, *et al.*,** | * | |
| **Respondents.** | * | |

**MEMORANDUM OPINION**

Kamal Muhammad filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF 1. The respondents filed an answer to the petition, asserting it must be dismissed because Muhammad's claims either are procedurally defaulted or lack merit. ECF 19. No hearing is necessary. *See* Rule 8(a), *Rules Governing § 2254 Cases in the U.S. Dist. Cts.*; Loc. R. 105.6 (D. Md. 2025); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For the following reasons, the petition is dismissed, and a certificate of appealability shall not issue.

## I. Background

In August 2012, Muhammad was indicted in the Circuit Court for Baltimore City on 15 counts. *State v. Caldwell*, Case No. 112230019 (Cir. Ct. Balt. City); ECF 20-1, at 6–7, 38–39, 43–44.[1] Muhammad's first jury trial was in April 2014 and resulted in a conviction of attempted second-degree murder, first-degree assault, second-degree assault, possession of a deadly weapon

[1] Muhammad is also known as Melvin Caldwell.

with intent to injure, and fourth-degree sex offense.[2] *Id.* at 12–13, 180. On appeal, the Appellate Court of Maryland ("Appellate Court") (then known as the Court of Special Appeals of Maryland) reversed the convictions, finding that the trial court had erred by admitting a prior consistent statement of the victim. *Id.* at 179–98. Muhammad was retried in May 2016. *Id.* at 20–22.

On May 2, 2016, the first day of the retrial, Muhammad's arrival in the courtroom was delayed for reasons beyond his control. ECF 3, at 3. Before he arrived, the trial court conducted some business with counsel. First, after Muhammad's counsel waived Muhammad's presence solely for the purpose of discussing *voir dire*, the trial court conferred with counsel regarding the phrasing of *voir dire* questions. *Id.* at 4. Next, Muhammad's counsel advised the court that counsel intended to move to limit Detective Bell's testimony. *Id.* at 5. The trial judge shared her thoughts on the merits of the motion, but Muhammad's counsel asked that the judge wait until Muhammad arrived before continuing the discussion. *Id.* at 6. The court responded:

> I just want to get, you know, we can go over this all over again once he—when he's here if there's something I need to be looking at now, because the problem's going to be, once he gets here, I have to get him up here, the jury's ready, they've got to come. So, it's going to be very difficult to be flushing out a lot of this stuff. So, you know, all this can go on the record again once he's here, is generally my practice. If there is something else about it—now I told you I've already ruled—I will not re-litigate the motions that Judge Murdock already did, and she heard all your other [motions] . . . .

*Id.* at 6–7. The trial court then proceeded to discuss the defense motion to limit the forensic examiner nurse's testimony. *Id.* at 8–15. The prosecutor provided the state's position, defense counsel argued, and the trial court stated, "We're not going to go crazy with this, so I'm going to rule when your client gets here." *Id.* at 15.

[2] The jury acquitted Muhammad of attempted first-degree murder, attempted first-degree rape, attempted second-degree rape, first-degree sexual offense, second-degree sexual offense, and third-degree sexual offense. ECF 20-1, at 180 n.1.

The trial court then asked the state to explain its pretrial motion. *Id.* The prosecutor explained that the defense obtained a certified letter from the City of Baltimore about the existence of a closed-circuit camera on Argyle Avenue, where the crime occurred, and only informed the state about the camera a few days earlier, so the state sought to exclude "any mention of a camera, the public record that [defense counsel] provided [the prosecutor], and any photographs of the camera, any photographs that purport to be from the camera's angle . . . ." *Id.* at 16–18. Muhammad's counsel asked: "Can we—can we wait to do this until my client gets here? I mean, this is—we're getting pretty in-depth at this point." *Id.* at 17. The trial court responded, "I kind of agree. So, let's—I mean, I guess I'm just going to have—we'll deal with it." *Id.* at 17, 19. Yet, the parties continued to argue the merits of the state's motion for another 26 pages of transcript. *Id.* at 19–46. At the end of argument, the trial court stated that everything would be put on the record after Muhammad arrived. *Id.* at 46.

Muhammad eventually arrived in the courtroom, and the parties proceeded to select a jury. *Id.* at 53. After jury selection, the trial court discussed the motions that had been argued outside Muhammad's presence and officially ruled on them. ECF 5, at 63–69. Then, the trial began.

According to the Appellate Court, the following facts were adduced at Muhammad's second trial:

> On the night of July 21, 2012, Baltimore City Police Detective Willie Craft was on patrol when he received a call to respond to 637 West Lafayette Street. When he arrived at that location, he observed a vacant dwelling with the windows and front door boarded up. There were two women on the opposite side of the street yelling out to him. As the detective approached the vacant building, he heard the "faint loud cry" of a woman calling for help. He attempted to pull the wood from the front door but was unable to remove it. When other police units arrived, Detective Craft went to the rear of the building, where he saw a "slight step-up wall" and a fence that was overgrown with shrubbery. Detective Craft also observed a naked black man, later identified as Muhammad, crouched down and walking away from the dwelling holding in his hands something that looked like clothing.

Detective Craft identified himself as a police officer and told Muhammad to stop, but Muhammad dropped the items he had been carrying and ran. Detective Craft chased Muhammad and eventually caught up to him. When Muhammad had his hands up, the detective walked up behind him. As he did so, Muhammad turned around and his arm came back toward the detective. Detective Craft struck Muhammad's neck with his arm and Muhammad fell to the ground, at which point he was arrested. Detective Craft noticed that Muhammad had scratches on his face.

While another officer watched over Muhammad, Detective Craft and other officers entered the boarded-up dwelling at 637 West Lafayette Street. There was no power in the house and the interior was dark. Using flashlights, Detective Craft and the other officers made their way into a room at the front of the house. Detective Craft saw "blood all over the floor and the walls" and a mattress that had a blood-soaked sheet and a blood-soaked knife lying on it. As he continued to scan the room, Detective Craft saw a naked woman, later identified as L.M., covered in blood and lying on her back on the floor. Detective Craft observed "penetrated wounds" on L.M.'s neck, the side and back of her head, and her arms. L.M., who was not responsive, was transported to Shock Trauma.

Detective Craft returned to the area behind the house where he had first observed Muhammad. Police eventually recovered a black wallet containing Muhammad's Maryland identification card, Social Security card, and medical card. They also found a purse containing L.M.'s Maryland identification card, a syringe, a vial and a bottle cap both containing residue, a shoe with blood on it, two socks, a ten-dollar bill, and a ruby earring.

On the morning following the incident, Baltimore City Police Detective Robert Bell, Jr.,[2] transported a sexual assault forensic examination ("SAFE") nurse, Ben Lebovitz, to Shock Trauma to perform a SAFE examination on L.M., who was intubated and sedated.[3] Nurse Lebovitz observed a hematoma on the right side of L.M.'s forehead, some ecchymosis under her right eye, and abrasions on her upper lip, left inner thigh, right inner knee, and left elbow. One of L.M.'s teeth was missing, another was loose, and there was blood in her mouth. Nurse Lebovitz opined that the injuries to L.M.'s face, particularly the hematoma on her forehead and the ecchymosis under her eye, were consistent with blunt force trauma. During a genital examination, Nurse Lebovitz observed multiple small abrasions throughout L.M.'s vagina, some small abrasions on the hymen, and some small abrasions on the labia minora. Nurse Lebovitz collected swabs from L.M.'s oral cavity, external genitalia, vagina, anus, and fingernails. L.M.'s toxicology report was positive for the presence of cocaine and opiates. Four days after she was stabbed, L.M.'s breathing tube was removed and she was brought out of sedation, which enabled her to speak. Detective Bell, who was assigned to investigate L.M.'s case, interviewed her in Shock Trauma.

As part of his investigation, Detective Bell obtained a search and seizure warrant and collected forensic evidence from Muhammad through the use of a suspect's SAFE examination. During the SAFE examination, the nurse collected a sample of

Muhammad's blood, oral and facial swabs, fingernail scrapings, hair from his head, pubic hair combings, and pubic hair. Muhammad's blue and white boxer shorts were seized, and photographs were taken of scratch marks on his face.

L.M. testified that for many years she had been addicted to heroin and, at the time of the trial, she was in a methadone program. On July 21, 2012, she planned to go to her sister's house for a crab feast. Before going there, L.M. went to an area near Argyle Street to purchase "a pill of dope" to take with her so she would not become sick or uncomfortable from heroin withdrawal. L.M. acknowledged that she carried a syringe with her because she was part of a needle exchange program. No one was outside dealing drugs, so she began to walk back toward her home. At some point, L.M. noticed Muhammad walking behind her. He put his arm around her in "a sleep hold," became "very aggressive," and said, "I'm going to kick out some pussy." As Muhammad took her through a small "gully" or walkway, L.M. became unable to breathe and eventually, "everything started getting dark." The next thing L.M. remembered was waking up naked and seeing Muhammad, who was also naked, standing over her.

Muhammad told L.M. to "suck my dick." At first, L.M. complied with his request, but then she decided to bite his penis. As she decided to do so, Muhammad started backing away from her. L.M. bit down and Muhammad started pushing her forehead and hitting her. Some of L.M.'s teeth were knocked out and, when Muhammad's penis fell out of her mouth, L.M. jumped up and ran toward a boarded-up window or door and yelled for help. Muhammad grabbed her by the hair and told her she was going to die. L.M. scratched Muhammad, but he got her on the floor and started choking her. L.M. felt something like a jar or glass on the floor, picked it up, and hit Muhammad with it. Thereafter, she lost consciousness. The next thing L.M. recalled was waking up in Shock Trauma.

A DNA analyst testified that a fingernail swabbing from L.M. yielded a DNA profile that was a mixture of L.M. and Muhammad's DNA. Swabs from the knife blade and handle yielded DNA from L.M and at least one indeterminate minor contributor.

A blood stain from a sock also yielded DNA from L.M. and at least one indeterminate minor male contributor. Glenn Ehasz, a private detective, testified on behalf of the defense. He first visited the scene of the crime on November 23, 2013. On that date, he photographed and measured the "gully" or walkway and photographed the building located at 637 W. Lafayette Street. Mr. Ehasz stated that the walkway was about 26 ½ inches wide. About six weeks later, Mr. Ehasz returned to 637 W. Lafayette Street and entered the vacant house, which he described as boarded up and dark.

The defense also called Baltimore City Police Detective Helen Mateo as a witness. She assisted Detective Bell in investigating the case. Detective Mateo did not recall if there were police cameras in the vicinity of 637 W. Lafayette Street. She stated that she did not review any police camera footage as part of her investigation.

> [2] At some time after testifying in Muhammad's first trial, Detective Bell died. During the May 2016 trial, a redacted video recording of his prior testimony was played for the jury.
>
> [3] The SAFE program is run exclusively out of Mercy Medical Center in Baltimore City. Detective Bell went to Mercy, picked up a SAFE kit, and transported the kit and nurse Lebovitz from Mercy to Shock Trauma.

ECF 20-1, at 285–90.

The jury convicted Muhammad of attempted second-degree murder. ECF 14, at 35. He was acquitted of fourth-degree sex offense. *Id.* at 34. The trial court sentenced him to 30 years of imprisonment. *Id.* at 80.

Muhammad appealed his conviction to the Appellate Court. ECF 20-1, at 200–43. He asserted three assignments of error:

(1) "The trial court erred by excluding a key defense witness based on rules violations without exercising any discretion";

(2) "The trial court erred by permitting the prosecutor to argue that Mr. Muhammad's DNA was found on the knife when there was no evidence that it was";

(3) "The trial court erred by permitting the complaining witness to give irrelevant and highly prejudicial victim impact testimony[.]"

ECF 20-1, at 201–02. On April 24, 2017, the Appellate Court issued an opinion affirming Muhammad's conviction. *Id.* at 284–300. The Supreme Court of Maryland (then known as the Court of Appeals of Maryland) subsequently denied Muhammad's petition for a writ of certiorari. *Id.* at 303–34, 348.

On June 6, 2017, Muhammad, proceeding without counsel, filed a petition for postconviction review. *Id.* at 336–47. The court appointed counsel for Muhammad, and through counsel, Muhammad amended his petition on May 12, 2021, withdrawing eight claims and adding three additional claims. *Id.* at 377 & n.4, 380. Ultimately, Muhammad claimed that he was entitled to relief because:

(1) His trial counsel was ineffective because he did not obtain Muhammad's consent for pretrial motions to be heard outside of Muhammad's presence, *id.* at 338;

(2) His trial counsel was ineffective because he failed to object and failed to move for a mistrial after the trial judge directed the prosecutor to put 20 to 30 photos from the first trial into evidence in the second trial, *id.* at 342–43;

(3) His trial counsel was ineffective because he failed to object to the two responses the trial court gave to the jury notes, *id.* at 343;

(4) His trial counsel was ineffective because he failed to attack the victim's testimony that Muhammad had a bald head as false, *id.* at 344;

(5) His trial counsel was ineffective because he "trick[ed]" Muhammad into not testifying in his own defense, *id.*;

(6) His trial counsel was ineffective because he failed "to inform the court and/or ask for a postponement when Mr. Muhammad told him that he was not thinking clearly due to the psychological symptoms he was experiencing and the effects of his prescribed medications," *id.* at 377;

(7) His trial counsel was ineffective because he failed "to ensure that Mr. Muhammad was able to meaningfully participate in jury selection and bench conferences," *id.* at 380;

(8) His appellate counsel was ineffective because he failed "to ask for appellate review of the trial court's decision to conduct a pre-trial hearing when Mr. Muhammad was not present," *id.*

The postconviction court held a hearing on August 13, 2021, ECF 20-2, and denied Muhammad's petition on March 18, 2022, ECF 2-1. The postconviction court rejected Muhammad's claim that trial counsel did not obtain his consent before the trial court heard pretrial motions outside of his presence. The postconviction court found that the trial court did not hear pretrial motions outside of Muhammad's presence. ECF 2-1, at 8–9. The postconviction court noted that "trial counsel waived Petitioner's presence to discuss *voir dire* with the trial court and opposing counsel," but the waiver was "[j]ust [for] *voir dire*." *Id.* Though counsel and the trial court discussed trial counsel's "intention to argue a motion to exclude the testimony of a particular witness," Muhammad's "trial counsel requested that the trial court wait until Petitioner arrived before speaking substantively about the motion." *Id.* at 9. In response, the trial court "expressly

ended any substantive motions discussions" by stating: "We're not going to go crazy with this, so I'm going to rule when your client gets here." *Id.* The prosecutor then presented additional argument, and defense counsel asked "to wait to do this until [his] client [got to court]" because they were "getting pretty in-depth." *Id.* The trial court agreed and stopped the discussion. *Id.* Ultimately, the postconviction court found, upon a review of the transcript, that "the trial court did not conduct a pre-trial motions hearing without Petitioner's presence. Rather, the trial court, trial counsel, and opposing counsel spoke generally about what motions would be put on the record upon the arrival of Petitioner[.]" *Id.* The postconviction court quoted extensively from the transcript, finding that, once Muhammad arrived in the courtroom, the trial court "explained what had been generally discussed pertaining to counsels' motions and ruled on those motions on the record." *Id.* at 10–21. The postconviction court concluded that Muhammad failed to show that counsel's performance was deficient because Muhammad did not "adequately set forth facts supporting" his contention that the court heard the pretrial motions outside of his presence. *Id.* at 22. The postconviction court reasoned:

> [T]he record shows Petitioner was not excluded from the hearing on his motions. The part of the proceedings about which Petitioner complains did not result in any prejudice, nor did it constitute the actual hearing. Counsel merely apprised the trial court of the issues, and the trial court, as well as counsel, expressly waited for Petitioner to be present before conducting the hearing.

*Id.*

Muhammad sought leave to appeal. ECF 20-1, at 383–87, 390–97. He stated that the issue on appeal was "whether it is sufficient, to satisfy the defendant's constitutional right to be present at a motions hearing, for the court to later tell the defendant what was discussed at the hearing in his absence and tell the defendant the court's rulings[.]" *Id.* at 390. He argued that "the post-conviction court erred in finding that no motions hearing occurred in Mr. Muhammad's absence."

*Id.* at 391. The Appellate Court subsequently denied Muhammad's application for leave to appeal. *Id.* at 398–99.

Muhammad filed his petition for a writ of habeas corpus in this Court on April 6, 2023, alleging:

> Ground One: His appellate counsel was ineffective because he failed to claim on direct appeal that the trial court erred by conducting a pretrial hearing outside Muhammad's presence, ECF 1, at 7; ECF 1-1, at 9;
>
> Ground Two: "The postconviction court erred by finding that no pre-trial motion[s] hearing took place outside of the presence of Mr. Muhammad," ECF 1, at 7; ECF 1-1, at 14–18;
>
> Ground Three: The Appellate Court erred by refusing to review the postconviction court's decision, ECF 1, at 7;
>
> Ground Four: His trial counsel was ineffective because he failed "to inform the trial court and/or ask for a postponement when Mr. Muhammad told him that he was not thinking clearly due to psychological symptoms he was experiencing and the effects of prescribed medications," ECF 1, at 8; ECF 1-1, at 5–8;
>
> Ground Five: The federal court should review what he believes was an inconsistent verdict, ECF 1, at 8; ECF 1-1, at 11–1;
>
> Ground Six: His trial counsel was ineffective because he failed "to ensure that Mr. Muhammad was able to meaningfully participate in jury selection and bench conferences," including a bench conference where a "juror was being investigated and questioned by the trial court judge," ECF 1, at 8; ECF 1-1, at 2–4;
>
> Ground Seven: His trial counsel was ineffective because he failed to challenge the victim's false testimony that Muhammad had a bald head, ECF 1, at 8;
>
> Ground Eight: "The trial court erred by excluding a key defense witness," ECF 1, at 9; ECF 1-1, at 26–42;
>
> Ground Nine: "The trial court erred by permitting the prosecutor to argue that Mr. Muhammad's DNA was on the knife when there was no evidence that it was," ECF 1, at 9; ECF 1-1, at 19–21;
>
> Ground Ten: "The trial court erred by permitting the complaining witness to give irrelevant and highly prejudicial victim impact testimony," ECF 1, at 9; ECF 1-1, at 22–25.

The respondents argue that Grounds One, Four, Five, Six, Seven, Nine, and Ten are procedurally defaulted because they were not properly presented to the state courts. ECF 19, at 37–40, 58–65. The respondents also argue that Ground Three is non-cognizable and Grounds Two and Eight lack merit. *Id.* at 40–58. Muhammad filed three replies challenging the respondents' procedural defenses. ECF 22, 24, 26.

## II. Procedural Default

When a state prisoner fails to exhaust available remedies in state court before filing a habeas petition in federal court and the state court "would . . . find the claims procedurally barred," the claims are deemed procedurally defaulted, and the federal court generally may not consider them. *Juniper v. Davis*, 74 F.4th 196, 208–09 (4th Cir. 2023) (quoting *Mahdi v. Stirling*, 20 F.4th 846, 892 (4th Cir. 2021)). A procedural default also may occur when a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999); *see also Gray v. Zook*, 806 F.3d 783, 798 (4th Cir. 2015) ("When a petitioner fails to comply with state procedural rules and a state court dismisses a claim on those grounds, the claim is procedurally defaulted."). As the U.S. Court of Appeals for the Fourth Circuit has explained, "if a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)). A federal court may consider a procedurally defaulted habeas claim only if the claim falls within a recognized exception. *Richardson v. Kornegay*, 3 F.4th 687, 695 (4th Cir. 2021).

A person convicted of a criminal offense in Maryland may exhaust a claim by presenting it to the highest state court with jurisdiction to hear it, either on direct appeal or in postconviction proceedings. *See Mickens v. Taylor*, 240 F.3d 348, 356 (4th Cir. 2001); *Breard*, 134 F.3d at 619. To exhaust a claim on direct appeal in non-capital cases, a defendant must assert the claim in an appeal to the Appellate Court of Maryland and, if leave is granted, to the Supreme Court of Maryland by way of a petition for a writ of certiorari. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 12-201, 12-301. If the Supreme Court of Maryland does not grant leave to file a petition, there is no further review available, and the claim is exhausted. *See* Cts. & Jud. Proc. § 12-202(4).

For claims that are not appropriate for relief on direct appeal, the petitioner must pursue state post-conviction proceedings. To exhaust a claim through that avenue, the petitioner must raise the claim in a petition to the state circuit court where they were convicted, and if unsuccessful, they must raise the claim in an application for leave to appeal to the Appellate Court of Maryland. *See* Md. Code Ann., Crim. Proc. § 7-109. If the Appellate Court denies the application, there is no further review available, and the claim is exhausted. *See* Cts. & Jud. Proc. § 12-202(4). However, if the application is granted but relief on the merits of the claim is denied, the petitioner must file a petition for writ of certiorari to the Supreme Court of Maryland. *See Williams v. State*, 438 A.2d 1301, 1305 (Md. 1981).

The respondents argue that Grounds One, Four, Six, and Seven are procedurally defaulted because, even though these claims appeared in Muhammad's postconviction petition, Muhammad did not include them in his application for leave to appeal the denial of his postconviction petition. ECF 19, at 37–40. The respondents argue that Ground Five is procedurally defaulted because it was never presented to any state court. *Id.* at 38. The respondents argue that Ground Nine is procedurally defaulted because the Appellate Court dismissed it on a state procedural rule, *id.* at

59–61, and that Ground Ten is procedurally defaulted because Muhammad failed to fairly present it to the state courts as a constitutional claim, *id.* at 62–65.

Grounds One, Four, Six, and Seven are procedurally defaulted. In all four grounds, Muhammad claims his attorneys were ineffective for different reasons. ECF 1, at 7–8; ECF 1-1, at 2–8. In Ground One, Muhammad claims his appellate counsel was ineffective because counsel failed to claim on direct appeal that the trial court erred by conducting a pretrial hearing outside Muhammad's presence. ECF 1, at 7; ECF 1-1, at 9. In Grounds Four, Six, and Seven, Muhammad claims his trial counsel was ineffective because counsel did not notify the trial court or seek a postponement when counsel knew Muhammad was not thinking clearly, did not ensure Muhammad could "meaningfully participate in jury selection and bench conferences," and did not object when the victim testified falsely. ECF 1, at 8; ECF 1-1, at 2–8. Muhammad raised these four grounds in his postconviction petition. ECF 20-1, at 344, 377, 380. But he did not raise them in his application for leave to appeal the denial of his postconviction petition. In the application, Muhammad, represented by counsel, stated that the issue on appeal was "whether it is sufficient, to satisfy the defendant's constitutional right to be present at a motions hearing, for the court to later tell the defendant what was discussed at the hearing in his absence and tell the defendant the court's rulings[.]" *Id.* at 390. Muhammad argued that "*the post-conviction court erred* in finding that no motions hearing occurred in Mr. Muhammad's absence." *Id.* at 391 (emphasis added). He did not argue in his application for leave to appeal the denial of his postconviction petition that he was denied effective assistance of appellate counsel because his appellate lawyer did not claim on direct appeal that the trial court erred by conducting the hearing without him. As for Grounds Four, Six, and Seven, Muhammad did not raise ineffective assistance of trial counsel in his application for leave to appeal the postconviction decision or on direct appeal. *See Pevia v. Bishop*, No. ELH-

16-1223, 2019 WL 3412649, at *13 (D. Md. July 26, 2019) ("The unexhausted claims are procedurally defaulted, as [the petitioner] failed to present them in his application for leave to appeal and the state courts would now find that he cannot assert those claims."). Thus, Grounds One, Four, Six, and Seven are procedurally defaulted.

Ground Five—that the jury rendered inconsistent verdicts—also is procedurally defaulted because Muhammad did not raise this issue in state court at all. Muhammad insists he did, citing the transcript of his June 14, 2016 sentencing hearing. ECF 26, at 3. True, Muhammad's counsel argued during the hearing that Muhammad was entitled to a new trial, in part, because the jury verdicts were inconsistent. ECF 14, at 49–50. However, Muhammad did not challenge the verdicts as inconsistent on direct appeal. Thus, Muhammad failed to exhaust this claim because he did not present it to the highest state court with jurisdiction to hear it. *See Mickens*, 240 F.3d at 356. Therefore, Ground Five is procedurally defaulted because the state court "would . . . find the claim[] procedurally barred." *See Juniper*, 74 F.4th at 208–09 (quoting *Mahdi*, 20 F.4th at 892).

Ground Nine—that the trial court erred by permitting the prosecutor to argue that Muhammad's DNA was on the knife found at the crime scene—also is procedurally defaulted because he did not fairly present this claim to the state courts. A habeas petitioner meets the exhaustion requirement by "'fairly present[ing]' his claim in each appropriate state court," thereby "alert[ing] that court to the claim's federal nature." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)). To satisfy his burden, the petitioner must show that "both the operative facts and the controlling legal principles [were] presented to the state court." *Jones v. Sussex I State Prison*, 591 F.3d 707, 713 (4th Cir. 2010) (alteration omitted) (quoting *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000)). In his brief on direct appeal, Muhammad claimed that the trial court should not have permitted the prosecutor to argue that

Muhammad's DNA was on the knife, but Muhammad cited only Maryland law as grounds for the error. ECF 20-1, at 229–31. Muhammad did not raise a federal constitutional challenge to the prosecutor's conduct in the state courts. Because Muhammad did not put the Appellate Court on notice of the federal nature of the claim asserted in Ground Nine, it is procedurally defaulted.

Ground Ten—that the trial court erred by permitting the victim to give irrelevant and prejudicial testimony—also is procedurally defaulted. On direct appeal, Muhammad raised a claim that his counsel was ineffective for failing to object to irrelevant and prejudicial victim impact evidence. ECF 20-1, at 202. But the Appellate Court found that the claim was waived because Muhammad's trial counsel did not object to the testimony. *Id.* at 299. Because the Appellate Court enforced Maryland's contemporaneous objection rule—an independent and adequate state ground for disposing of the claim—Ground Ten is procedurally defaulted. *See Wainwright v. Sykes*, 433 U.S. 72, 85 (1977) (holding that a federal habeas petitioner who failed to comply with a state's contemporaneous objection rule must show cause for the procedural default to obtain habeas review); *Lowe v. Dovey*, No. SAG-20-3429, 2023 WL 131042, at *5 (D. Md. Jan. 9, 2023) (concluding that Maryland's contemporaneous objection rule is "an independent and adequate state ground" sufficient to bar federal habeas review).

Muhammad may no longer properly raise Grounds One, Four, Five, Six, Seven, Nine, or Ten in state court because he has no available avenue for relief there. He has already filed a petition for postconviction relief, and Maryland permits only one such petition. *See* Crim. Proc. § 7-103(a). Moreover, the deadlines for filing a direct appeal or an appeal of the denial of postconviction relief have long since passed. *See* Md. R. 8-202, 8-204. Thus, because Muhammad cannot properly raise Grounds One, Four, Five, Six, Seven, Nine, or Ten in state court, they are procedurally defaulted.

If, as here, a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits; or (2) that the failure to consider the claim on the merits would result in a miscarriage of justice—the conviction of an actually innocent person. *See Murray v. Carrier*, 477 U.S. 478, 495–96 (1986); *Breard v. Pruett*, 134 F.3d 615, 620 (4th Cir. 1998). "Cause" consists of "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim in state court at the appropriate time." *Breard*, 134 F.3d at 620 (quoting *Murray*, 477 U.S. at 488). To demonstrate prejudice, the petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982); *see Murray*, 477 U.S. at 494. Under the second exception, a petitioner may obtain review of procedurally defaulted claims if the case "falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup v. Delo*, 513 U.S. 298, 314–15 (1995) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). Such cases are generally limited to those for which the petitioner can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327. Under *Schlup*, a gateway actual innocence claim must be "truly 'extraordinary.'" *Id.* (quoting *McCleskey*, 499 U.S. at 494).

Muhammad argues that the procedural default should be excused because his postconviction counsel did not properly appeal the denial of his postconviction petition. ECF 24, at 4–5. However, "a [postconviction appellate counsel's] error does not qualify as 'cause' . . .

unless [it] amounted to constitutionally ineffective assistance of counsel." *Mahdi*, 20 F.4th at 893 (quoting *Davila v. Davis*, 582 U.S. 521, 524 (2017)). Muhammad has not established that a failure to raise all issues on appeal of the denial of his postconviction petition amounted to ineffective assistance of counsel. Thus, neither exception to the procedural default bar applies.

Muhammad has not established an exception to the procedural default rule. Grounds One, Four, Five, Six, Seven, Nine, and Ten are procedurally defaulted. Thus, the Court will consider only the merits of the claims in Grounds Two, Three, and Eight.

## III. Standard of Review

A state prisoner's application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Section 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet" and requires reviewing courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v. Woodall*, 572 U.S. 415, 419–20 (2014) (noting "state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement") (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state's adjudication is

contrary to clearly established federal law under § 2254(d)(1) when the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of [the state court's] decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* (emphasis removed) (quoting *Williams*, 529 U.S. at 410). "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411).

Further, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination." *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341–342 (2006)).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part."

*Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true when state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.* at 379 (quoting *Wilson v. Ozmint*, 352 F.3d 847, 858 (4th Cir. 2003)).

## IV. Analysis

### A. Grounds Two and Three

Grounds Two and Three are interrelated, and the Court addresses them together. In both, Muhammad alleges constitutional error stemming from the trial court's decision to hear pretrial motions outside of his presence. ECF 1, at 7. In Ground Two, Muhammad contends that the postconviction court erred when it found that pretrial motions were not heard outside of his presence. *Id.* In Ground Three, Muhammad contends that the Appellate Court erred by failing to hear his appeal of the postconviction court's decision. *Id.* Neither claim, on its face, alleges a violation of the constitution or federal law—a prerequisite for granting habeas corpus relief. *See* 28 U.S.C. § 2254(a). Further, "claims of error occurring in a state post-conviction proceeding cannot serve as a basis for federal *habeas corpus* relief." *Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988); *see also Lawrence v. Branker*, 517 F.3d 700, 717 (4th Cir. 2008) (quoting *Bryant*); *Bell-Bey v. Roper*, 499 F.3d 752, 756 (8th Cir. 2007) (noting that "an infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas" petition because there is no constitutional guarantee of state postconviction proceedings) (quoting *Williams-Bey v. Trickey*, 894 F.2d 314, 317 (8th Cir. 1990)); *United States v. Dago*, 441 F.3d 1238, 1248 (10th Cir. 2006) ("[D]ue process challenges to post-conviction procedures fail to state constitutional claims cognizable in a federal habeas proceeding."). Even so, the Court liberally construes Grounds Two and Three as raising claims of ineffective assistance of counsel related to

counsel's alleged failure to object to the trial court's decision to hear argument on pretrial motions outside of Muhammad's presence.

"[T]o help ensure our adversarial system produces just results," the Sixth Amendment to the Constitution guarantees a criminal defendant the effective assistance of counsel. *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017) (citing *Strickland v. Washington*, 466 U.S. 668, 685 (1984)); *see also Buck v. Davis*, 580 U.S. 100, 118 (2017). To prevail on a claim of ineffective assistance of counsel, a petitioner must satisfy the familiar two-pronged test set forth in *Strickland*, 466 U.S. at 687–88. *See United States v. Freeman*, 24 F.4th 320, 326 (4th Cir. 2022) (en banc). That test requires the petitioner to show that (1) his counsel's performance was deficient and (2) he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *Freeman*, 24 F.4th at 326. Ultimately, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To satisfy the deficient performance prong, a petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness." *Id.* at 688. Performance is evaluated based on "'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690); *see Carthorne*, 878 F.3d at 465. The "first prong sets a high bar." *Buck*, 580 U.S. at 118. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland*, 466 U.S. at 689. "[J]udicial scrutiny of counsel's performance must be highly deferential." *Carthorne*, 878 F.3d at 465 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000)). For Sixth Amendment purposes, it generally is sufficient "when counsel provides reasonably effective assistance, including demonstrating legal

competence, doing relevant research, and raising important issues." *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 691. Conversely, counsel's "ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance[.]" *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A petitioner cannot show prejudice when the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

In evaluating whether the petitioner has satisfied the two-pronged test set forth in *Strickland*, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991–92 (4th Cir. 2015) (citing *Strickland*, 466 U.S. at 697). Because failing either prong is fatal to a petitioner's ineffective assistance of counsel claim, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

Muhammad is not entitled to habeas relief on Grounds Two or Three because he cannot establish either *Strickland* prong.

Muhammad cannot show that his counsel's performance was deficient because Muhammad had no constitutional right to be present during the hearing on pretrial motions. An accused has the right under the Due Process Clause "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975); *see Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) ("[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure."). This due process right does not include a right to be present at every pretrial or post-trial motion hearing. *See United States v. Lynch*, 132 F.2d 111, 113 (3d Cir. 1942). And, the critical question is not whether the accused would have avoided conviction by his presence, "but whether the [accused's] presence at the proceeding would have contributed to the [accused's] opportunity to defend himself against the charges." *Kentucky*, 482 U.S. at 744 n.17. To satisfy this standard, the accused's presence must have "a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge," such as "to confront one's accusers and cross-examine them face to face." *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934). There is no right to be present "when presence would be useless, or the benefit but a shadow." *Id.* at 106–07. As with violations of other constitutional rights, a violation of the right to be present at certain stages of the criminal proceedings is "subject to harmless-error analysis[.]" *Rushen v. Spain*, 464 U.S. 114, 117 n.2 (1983).

Here, Muhammad was not present for legal arguments during a pretrial hearing on motions in limine. Outside of his presence, defense counsel argued that certain evidence should be excluded because Muhammad was acquitted of rape at the first trial. ECF 3, at 5–15. Also outside of his presence, the prosecutor argued that a document should be excluded from evidence because the document could not be "properly authenticated," was "hearsay," was "irrelevant," and was

"[subject] to [a] discovery violation." ECF 3, at 17–18. Muhammad complains that his attorney argued motions when he was not present and did not object to the hearing being held outside his presence, but Muhammad has not demonstrated how his presence during argument on the motions would have contributed to his opportunity to defend against the charges. Neither side introduced evidence or called witnesses during the hearing, so Muhammad was not denied the right to confront witnesses. Thus, even if part of the motions hearing was conducted outside of Muhammad's presence, his presence was not constitutionally required. Because Muhammad had no constitutional right to be present during the hearing, Muhammad's trial counsel was not deficient when counsel argued pretrial motions in limine outside of Muhammad's presence and did not object when the court continued to hear argument after counsel asked the Court to wait for Muhammad to arrive.

Further, trial counsel's performance was reasonable. Muhammad's counsel agreed to waive Muhammad's presence only regarding *voir dire* discussions, confirmed that he had not waived Muhammad's presence in any other regard, and asked the trial court, on at least two occasions, to wait for Muhammad to be present before they discussed the motions in depth. ECF 3, at 6, 17. Under these circumstances, trial counsel's performance was not deficient.

Muhammad also cannot show prejudice. Muhammad has not explained how the outcome of the pretrial motions would have favored him or how the ultimate outcome of his trial would have been different if he had been present during the hearing. Muhammad cannot demonstrate that trial or appellate counsel was ineffective for failing to raise the issue.

Grounds Two and Three lack merit and are dismissed.[3]

---

[3] If Ground One—Muhammad's claim that his appellate counsel was ineffective because he failed to claim on direct appeal that the trial court erred by conducting a pretrial hearing outside

### B. Ground Eight

In Ground Eight, Muhammad contends that, when the trial court excluded the testimony of defense witness Stephan Waters because Waters violated the sequestration rule, the court erred. Muhammad argues that the trial court should have asked whether Waters heard any prejudicial testimony before the court excluded Waters's testimony entirely. ECF 1, at 9. Muhammad claims that the exclusion of Waters's testimony impeded his right to present a defense. ECF 1-2, at 26–46.

Waters, an employee of the City of Baltimore, wrote a certified letter about the existence of closed-circuit cameras on Argyle Avenue, the area where the crime occurred, and the defense wanted to call Waters as a witness to testify about the existence of the cameras. ECF 1-2, at 37–39. Waters's testimony would have supported the defense theory that the police did not obtain available video evidence of the alleged crime. The state moved to exclude the evidence because, among other reasons, the defense failed to disclose it until the Friday before the second trial began. ECF 5, at 68–69. Before trial, the court ruled that, if the testimony of the state's witnesses opened the door for impeachment during trial, the defense could call Waters as an impeachment witness because impeachment witnesses are not subject to the witness disclosure rules. ECF 3, at 34–41.

At the beginning of the defense case, defense counsel advised the trial court that he intended to call two witnesses: Stephan Waters and Glen Ehasz. ECF 12, at 13. The state argued that Waters was not an appropriate impeachment witness. The trial court agreed because state witness Detective Craft had testified that he did not know whether there was a closed-circuit camera installed at the Argyle Avenue location at the time of the offense and Craft did not deny

---

Muhammad's presence—were not procedurally defaulted, it would fail on the merits for the same reason that Grounds Two and Three fail.

the camera's existence. *Id.* at 15–16. Muhammad's counsel objected, referring to Waters's testimony as "a huge part of [the defense] case." *Id.* at 17. The trial court commented that the defense should not have violated the rules of discovery and ruled that Waters could not testify. *Id.* at 19–20.

The defense proceeded to call its private investigator, Glen Ehasz, to the stand. *Id.* at 21–35. After Ehasz's testimony, defense counsel realized that he could call Detective Helen Mateo, who was present, to lay a foundation for impeachment on the police's failure to obtain video from the closed-circuit camera. *Id.* at 38. After defense counsel advised the court that he intended to call Detective Mateo, the prosecutor informed the court that Waters had been present in the courtroom during Ehasz's testimony. *Id.* at 39–40. Because Waters's presence in the courtroom during Ehasz's testimony violated the sequestration rule, the court ruled that Waters would not be permitted to testify. *Id.* at 40.

Detective Mateo testified that no cameras were reviewed as part of the police investigation, and she did not recall whether there were any cameras at the intersection of Argyle Avenue and Mosher Street. *Id.* at 41–42. After Detective Mateo's testimony, the trial court elaborated on the reason for excluding Waters's testimony:

> I just want to make it clear on the record in case it was not clear why defense witness Stephan Waters was not permitted to testify. Mr. Waters, as we discussed earlier in motions, was made known to the State on Friday and—along with the photographs and some documents that he had prepared, a letter, I believe. The court's ruling was that that was a violation of 4-263, that there was not proper notice given to the State for that witness to testify. However, I ruled that if he was an impeachment witness, he could testify if there was a witness to impeach. The court ruled today that there was no witness to impeach. That was the first reason why he couldn't testify. And then it became known that he had violated the sequestration rule because he was sitting in the courtroom during the testimony of the defense's first witness. Now, when the State's witness, Ms. Cobb, was sitting in the courtroom, the defense asked that the court not allow her to testify. The defense has been very concerned and talking a lot about what's just and with balancing the scales in this case and, therefore, Mr. Perkins said to the court the same as you had said about Ms. Cobb

> so, therefore, I did not allow him to testify because he violated the sequestration rule. Had you not objected to Ms. Cobb testifying, I would have allowed him to testify. So I just wanted to make sure the record is clear as to why that witness was not allowed to testify.

*Id.* at 54–55.

Muhammad raised Ground Eight on direct appeal. ECF 20-1, at 201. The Appellate Court concluded that the trial court committed no error:

> The record clearly reveals that the defense violated the discovery rules by identifying the letter, Waters, and the substance of Waters' testimony on the workday preceding the start of the trial. The court determined that the letter was not properly certified or authenticated and ruled, preliminarily, that under the proper circumstances, Waters could be called to impeach the testimony of any witness who testified that there were no cameras in the vicinity of the incident. The opportunity to use Waters to impeach another witness never materialized. Detective Craft testified that he did not know if there were any cameras in the area. Thus, we need not resolve the issue of whether the court erred in excluding Waters' testimony for violation of the sequestration order because, even if Waters had not violated the sequestration order, his testimony would not have been relevant and could not have been used for impeachment purposes. It is undisputed that Waters could not attest to the operation of the cameras when the incident in question occurred.
>
> Moreover, any error in precluding Waters' testimony was harmless. Detective Mateo, a defense witness, testified that there may have been a camera in the vicinity of the incident, but no footage was reviewed as part of the police investigation. As the State points out, defense counsel emphasized this fact when he argued in closing that the police "did not check for camera footage of something that happened on a City street. And we don't know about the availability of it." As a result, even if the trial court erred in excluding Waters' testimony for violating the sequestration order, such error was harmless. *Dorsey v. State*, 276 Md. 638, 659 (1976).

*Id.* at 294.

The question before this Court is whether the Appellate Court's disposition of this claim was "contrary to" or "an unreasonable application of" Supreme Court precedent. 28 U.S.C. § 2254(d)(1).[4] The Court first must "identify the 'clearly established Federal law, as determined

---

[4] Muhammad does not challenge any factual findings by the Appellate Court, so this Court need not consider whether the Appellate Court's disposition of this claim "was based on an

by the Supreme Court of the United States' that governs the habeas petitioner's claims." *Wood v. Straughn*, No. 25-6842, 2026 WL 2070833, at *7 (4th Cir. July 17, 2026) (quoting *Currica v. Miller*, 70 F.4th 718, 724 (4th Cir. 2023)).

Muhammad argues that the trial court's ruling excluding Waters's testimony violated his right to present a complete defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Evidentiary rules that "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve" violate the right of the accused to present a complete defense. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotations and alterations omitted). However, "[o]nly rarely" has the Supreme Court held "that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013). Muhammad was afforded a meaningful opportunity to present a complete defense despite the trial court's exclusion of Waters's testimony. It is clear from the record that the defense strategy was to establish a shoddy police investigation. In particular, the defense intended to establish through Waters that the police failed to recover potentially available closed-circuit video of the area where the crime occurred. With Waters unavailable, the defense presented the testimony of Detective Mateo, who admitted that the police did not review any camera footage during the investigation,

---

unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2). *See Wood v. Straughn*, --- F.4th ----, No. 25-6842, 2026 WL 2070833, at *7 (4th Cir. Jul. 17, 2026) ("Because Wood only identifies legal questions, we proceed to our review under § 2254(d)(1), under which we evaluate whether the state-court decision was "contrary to" or "an unreasonable application of" U.S. Supreme Court precedent.").

which allowed Muhammad's counsel to argue during closing "that the police 'did not check for camera footage of something that happened on a City street. And we don't know about the availability of it.'" ECF 20-1, at 295. True, Waters could have explained to the jury that a camera existed near the crime scene—a fact Mateo did not know about. But even so, there is no indication that Waters could have testified that the camera was operational, that it recorded footage at the time, or that the footage had been preserved. More importantly, Waters's testimony, at most, would have impugned the integrity of the investigation; it would not have been exculpatory. Waters could not testify that there was video footage tending to exonerate Muhammad. The Appellate Court's conclusion that any trial court error in excluding Waters's testimony was harmless is not contrary to Supreme Court law guaranteeing a defendant's right to present a complete defense.

The Appellate Court's harmlessness analysis also did not unreasonably apply clearly established federal law. The Court "consider[s] whether the state [appellate] court's application [of Supreme Court precedent] is one that is 'objectively unreasonable, not simply incorrect.'" *Wood*, 2026 WL 2070833, at *10 (quoting *Owens v. Stirling*, 967 F.3d 396, 411 (4th Cir. 2020)). The Appellate Court concluded that the exclusion of Waters's testimony was harmless because other evidence established that, if there was closed-circuit video of the relevant events, the police did not recover it. That is what the defense sought to establish through Waters's testimony that there was a camera near the crime scene. The Appellate Court's denial of this claim based on harmless error is consistent with how a reasonable jurist could resolve such a claim. *See Richardson*, 3 F.4th at 698–99 (denying habeas relief where "[f]ar from being so unreasonable as to violate clearly established due process rights, the state court's rejection of Richardson's claim f[ell] well within the range of what reasonable jurists do").

Ground Eight lacks merit and is dismissed.

## V. Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." 28 U.S.C. foll. § 2254. Because the accompanying Order is a final order adverse to the applicant, 28 U.S.C. § 2253(c)(1) requires issuance of a certificate of appealability before an appeal can proceed.

A certificate of appealability may issue if the prisoner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner may satisfy the standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a petition is denied on procedural grounds, the petitioner may meet the standard by showing that reasonable jurists "would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Id.*

Muhammad has failed to satisfy the applicable standard on any of his claims. Therefore, a certificate of appealability shall not issue.

A separate order dismissing the petition and denying a certificate of appealability follows.

August 26, 2026
Date

Deborah L. Boardman
United States District Judge